Filed 6/7/21

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MALCOLM NATHAN BREWER,<br><br>    Defendant and Appellant. | C089676<br><br>(Super. Ct. No. 17FE023299) |

APPEAL from a judgment of the Superior Court of Sacramento County, Allen H. Sumner, Judge. Affirmed.

Jyoti Malik, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Timothy L. O'Hair, Deputy Attorney General, for Plaintiff and Respondent.

1

Defendant Malcolm Nathan Brewer and codefendants Glen T. Conway and Shane Donta Williams participated in a string of armed robberies and attempted robberies, mostly of gas stations and convenience stores, in November and December 2017.[1]  In many of the robberies and attempted robberies, defendant personally used a firearm by displaying it to or pointing it at the victims.  Defendant and his codefendants were charged in a 20-count amended information with numerous counts of robbery and attempted robbery with firearm enhancement allegations as well as one count of felon in possession of a firearm.  Williams entered into a plea agreement.  Defendant and Conway proceeded to trial together before separate juries.

Defendant's jury found him guilty of 11 counts of second degree robbery, two counts of attempted second degree robbery, and one count of felon in possession of a firearm.  The jury found true the allegations that defendant personally used a firearm in connection with eight counts, and that a principal was armed with a firearm in connection with two other counts.  The trial court sentenced defendant, who had a strike prior, to an aggregate determinate term of 63 years.

On appeal, defendant contends his sentence, which he characterizes as the functional equivalent of a life sentence without parole imposed on a developmentally disabled person, constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and article I, section 17, of the California Constitution.  We reject defendant's contention that such a sentence categorically violates those constitutional provisions in the same way as imposition of the death penalty as to developmentally disabled adults and imposition of life without the possibility of parole (LWOP) as to juvenile defendants.  We further reject his argument that the sentence he received violated these constitutional prohibitions.

---

[1]  Unless otherwise noted, the underlying facts occurred in 2017.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

Defendant was charged, along with Conway and Williams, with 15 counts of robbery in the second degree (Pen. Code, § 211;[2] counts three-five,[3] seven-ten, twelve-nineteen), two counts of attempted second degree robbery (§§ 664, 211; counts six & eleven) and one count of felon in possession of a firearm (§ 29800, subd. (a)(1); count twenty). In connection with counts three through five, seven, eight, and ten through seventeen, it was alleged defendant personally used a firearm. (§ 12022.53, subd. (b).) In connection with counts eighteen and nineteen, it was alleged that a principal was armed with a firearm. (§ 12022, subd. (a)(1).) It was further alleged that defendant suffered a conviction of a prior serious felony within the meaning of section 667, subdivision (a), that qualified as a prior strike within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12).[4]

### Prosecution Evidence[5]

Generally, the robbery victims did not identify the perpetrators. However, as the Attorney General notes, defendant was implicated in the robberies through the testimony of an informant, DNA evidence, his own admissions, and video surveillance recordings.

---

[2] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

[3] Defendant was not charged in counts one and two.

[4] The prior strike was a 2011 first degree burglary conviction.

[5] The jury hung on counts three through five and the trial court declared a mistrial as to those counts and granted the prosecution's request to dismiss them. The jury found defendant not guilty on count sixteen. Given the limited nature of defendant's contentions on appeal, we discuss only those counts of which defendant was convicted and their underlying facts.

On appeal, defendant does not dispute his participation in any of the robberies or attempted robberies of which he stands convicted.

**Count Six - ampm on Marconi Avenue**

On November 24 at approximately 6:15 p.m., J.K., the store manager at the ampm on Marconi Avenue, saw two men enter the store. The men each wore something covering their faces, which led J.K. to believe they intended to rob the store. The store had been robbed a couple of days earlier.[6] J.K. could not tell if the men were armed. He tried to "run away from the register and save" himself, but the men were coming in too quickly. One man came in and held J.K., struggled with him, and pushed him against the register. The second man stood by. Although the men were attempting to rob the store, they were not able to take anything and they ran away. A surveillance video of the attempted robbery was played for the jury.

**Count Seven – ampm on Watt Avenue**

At 6:25 on the night of November 24, B.P., an employee at a Watt Avenue ampm, was working alone when two men robbed him.[7] He was in the back when he heard the bell indicating someone had entered the store. He saw two men with their faces covered and he realized they were going to rob him. The larger of the two men, Williams, grabbed B.P. and told him to open the register. The other man, defendant, wearing a black hoodie with camouflage sleeves, had a gun and pointed it at B.P. B.P. opened both registers but only one of them contained money. B.P. estimated that the men took more than $500. Defendant also took five to 10 packs of cigarettes. Surveillance video of the incident was played for the jury.

---

[6] That earlier robbery was the subject of count five.

[7] Defendant acknowledges that the two men were defendant and Williams and that defendant was the smaller of the two men.

**Count Eight – Shell Gas Station**

On November 25, E.C. was working as a cashier at Shell on Florin Road. At approximately 1:00 p.m., two men entered wearing masks.[8] One man, Conway, came in the register area and handed E.C. a note that said, " 'This is a robbery. Give it up.' " E.C. opened one cash register. The other man, defendant, who had a gun, went to the counter in front of E.C. Defendant pointed the gun at E.C. and told him to open the other register, saying " 'Open this up, this one right here.' " E.C. responded that he did not have access to that cash register. In actuality, E.C. could open the other register, but he "didn't want to give him what was in there." E.C. testified: "The thing about it is, I don't know why, I must have been stupid . . . , but the gun seemed like it was rusted out and it didn't seem like it's operational. And I had no fear at all for some reason." Meanwhile, B.N., the manager, was in her office when she observed the robbery. The men were wearing masks, but she could tell they were African-American. Defendant was holding E.C. at gunpoint. B.N. ran to the door, opened it, and told the men to leave, but she retreated to her office when defendant, wearing a black hoodie with camouflage sleeves, pointed a gun at her and told her to leave or he would shoot her. Surveillance video of the incident was played for the jury.

**Count Nine – G.C. and G.R.**

On November 25, G.C. went to GameStop with his friend G.R. They left GameStop and G.C. noticed they were being "scoped out a little bit" by "two dudes in a car." G.C. believed it was a Ford Taurus. There was "Raiders stuff all over the car, like the hood and both the doors, and flags out the . . . back windows."[9] G.C. and G.R. sat

---

[8] Defendant acknowledges the two men were Conway and defendant, and that defendant was the man who had a gun.

[9] Defendant's car is a Ford Taurus with Raiders stickers on the doors, hood, trunk, and rear windshield.

down on a bench and talked, and then noticed that the guys in the car drove around and parked near the bench. The guys approached them and asked them some questions. G.C. and G.R. tried to go back to the GameStop, but the guys from the car stopped them. One of the men walked very close to G.C., to the point of touching chests. He said something about a gun, although G.C. did not see a gun. The other man was standing to the side, but he was "saying . . . the stuff that was scaring [G.C.]. Stuff like, 'Don't lose your life over this.' " The man standing next to G.C. then took the bag from him. At trial, G.C. identified defendant as one of the two men. He also identified the Ford Taurus pictured in a number of photographs as the car the two men were in, and a photograph of a Star Wars Battlefront II video game as the game taken from him that day, which was later found in a hallway closet where defendant resided.

**Count Ten - Circle 6**

On November 25, Deputy Calvin Penwell of the Sacramento County Sheriff's Office was dispatched to a Circle 6 convenience store on Ethan Way and Alta-Arden Expressway. There, he spoke with an employee, B.S. B.S. did not testify at trial. The surveillance video recorded in and outside of the store shows a robbery. As shown in the video, two men entered the store together, their faces covered, followed by a third moments later, also with his face covered. As they entered the store, a man in a black hoodie with camouflage sleeves pointed a gun.[10] Defendant took B.S. behind the register, holding him at gunpoint. B.S. opened the register. Defendant then took money from the till. A second man in a hoodie with a graphic design assisted him with the till. Meanwhile, a man in a peacoat and ski mask made B.S. give him items he had on his person. It also appeared that defendant took merchandise from behind the register. The

---

[10] Defendant acknowledges he was the man wearing the black hoodie with camouflage sleeves who had a gun.

man in the peacoat pushed B.S. out of the register area. All three men left shortly thereafter, again two together at first and the third following behind.

### Count Eleven - Bell Market

On November 29, D.A. was at work at Bell Market. A man entered the store brandishing a gun and told D.A. to give him all his money.[11] D.A. responded, " 'Fuck you. I have no money,' " even though he did have money. D.A. also yelled for the owner, who was in the back, to come out. Defendant ran out. Surveillance video of the incident was played for the jury.

### Counts Twelve and Thirteen – Subway

J.S. and J.M. were working at a Subway restaurant on Florin Road on November 29 when two men came in and robbed the store.[12] J.S. was standing near the cash register when the men entered. Their faces were covered with masks. J.S. testified that they appeared to be African-American. One of the men demanded J.S. give him the money from the cash register and then he pulled out a gun. The men also asked for the money in the safe, but J.S. and J.M. did not have access to the safe. The men stole approximately $420. Surveillance video of the incident was played for the jury.

### Count Fourteen – Game Trader

J.E. was working as the manager at Game Trader on November 29. At approximately 5:00 p.m., two African-American men wearing masks entered the store. They "had the guns out already." J.E. later testified, however, that it was possible that only one of the robbers had a gun. One of the men did most of the talking, but the other was moving around the store and "was asking if anyone else was here, stuff like that."

---

[11] Defendant acknowledges that he was the man who entered the store, alone, brandishing a gun.

[12] Defendant acknowledges that the two men were defendant and Conway, and that defendant had a gun.

7

The men told J.E. to open the cash registers. J.E. opened both registers, even though one of the two registers did not have any money in it. There was $300 to $400 in the first cash register, which the men took. The men told J.E. to get the gaming systems and the latest video game titles. The men took eight to 10 video game consoles and approximately 50 video games, each of which cost $20 to $60. They also took J.E.'s Galaxy S7 cell phone.

J.E. testified that defendant was a customer at Game Trader. In that capacity, J.E. knew defendant for approximately six or seven years. J.E. had many conversations with defendant. J.E. testified that one of the robbers sounded like defendant. He was the one holding a gun and staying in the store with J.E. when the other made trips to the car.

**Count Fifteen – Stop N Shop**

R.P. worked at Stop N Shop in Carmichael. On November 29, two men came into the store at approximately 7:30 or 8:00 a.m. and robbed R.P. Their car "was painted Raiders and ha[d] a flag on it." At least one of the men had a gun. They passed R.P. a note that stated, " 'It is a robbery. Give it up.' " The man who had not given R.P. the note pulled out a gun and said, " 'Open it up. Give it up. Give it up.' "[13] The man with the gun had a bandana on his face but the other man did not. R.P. opened the cash register and gave the men approximately $140. A surveillance video of the incident was played for the jury. The video shows a man in a black hoodie with camouflage sleeves pointing a gun directly at R.P. from across the counter and taking the cash out of the cash till after R.P. opened it.

**Count Seventeen – Union 76**

W.F. was working at Union 76 on Fair Oaks Boulevard on December 13 when, at approximately 11:35 p.m., two men entered and robbed the store. W.F. was close to the

---

[13] Defendant acknowledges that he was the man who did not hand R.P. the note, and that he had a gun.

store entrance, making coffee. When the first man came through the door, he was not wearing a mask, but he quickly put one on. The second man entered the store holding a gun.[14] The men told W.F. they were there to rob her and told her to empty the registers. W.F. complied. While one man held W.F. at gunpoint, the other took the money from the registers. He also took cartons of cigarettes. The men also told her to open the safe, but she did not have access. W.F. estimated the men took approximately $80 from the registers and $105 from her personally. A surveillance video of the incident was played for the jury.

### Counts Eighteen and Nineteen – ampm on El Camino Avenue

D.G. was working at ampm on El Camino Avenue on December 13 with his coworker V.H. when a robbery occurred. One of the two men had a gun. V.H. opened the registers for the men. One of the men yelled for D.G. to open the safe. The other man, wearing a black hoodie with camouflage sleeves, did not say anything, but just grabbed the money and then the two men left. A surveillance video of the incident was played for the jury.

### Defendant's Arrest and Interview

Within six hours after the last robbery, in the early morning hours of December 14, Sacramento Police Department Officer John Fisher observed a Ford Taurus which had Raiders stickers "all over it." This matched a description of a vehicle described in a Sacramento County Sheriff's Office broadcast as a vehicle used in several armed robberies. Fisher and his partner stopped the vehicle, drew their weapons, and ordered the occupants to put their hands up. The passenger, Conway, complied. The driver, defendant, opened his door, exited the vehicle, made eye contact with Fisher, and then

---

[14] Defendant acknowledges that the first man to enter was Conway and the second, with a gun, was defendant.

ran. Fisher found a loaded .38 special revolver under the front passenger seat. Defendant was subsequently detained nearby.

Following his arrest, defendant was interviewed by Detective David Treat. The video recorded interview was played for the jury. In the interview, defendant implicated himself in a number of the robberies. However, he maintained that he was afraid of Williams, he was forced to participate in the robberies, and if he did not participate in the robberies with Williams, "something bad" would happen to him.

### Defense Evidence

Defendant did not present any evidence at trial. Conway testified on his own behalf. He denied participating in the robberies.

### Verdict and Sentencing

The jury found defendant guilty on counts six through fifteen and seventeen through twenty, but found him not guilty on count sixteen. The jury found true the allegations in counts seven, eight, ten through thirteen, fifteen, and seventeen that defendant personally used a firearm. (§ 12022.53, subd. (b).) The jury found not true the allegation that defendant personally used a firearm in connection with count fourteen. The jury found true the allegations in counts eighteen and nineteen that a principal was armed with a firearm. (§ 12022, subd. (a)(1).)

The trial court found true the allegation that defendant had a prior strike conviction. The trial court sentenced defendant to an aggregate determinate term of 63 years, calculated as follows: on count seven -- the upper term of five years, doubled due to the strike, plus 10 years on the section 12022.53, subdivision (b), enhancement attached to that count;[15] on count six -- one year four months (one-third the midterm

_____

[15] As it imposed 10 years for the section 12022.53, subdivision (b), firearm enhancement attached to count seven, the trial court noted its newly authorized discretion to strike the firearm enhancement. (§§ 12022.53, subd. (h), 1385.) However, it stated that, "[g]iven

10

doubled); on counts eight through ten, twelve through fifteen and seventeen through nineteen -- two years (one-third the midterm doubled); on count eleven -- one year four months (one-third the midterm doubled); on the section 12022.53, subdivision (b) firearm enhancement attached to counts eight, ten through twelve, fifteen, and seventeen - three years four months (one-third the midterm); on the section 12022.53, subdivision (a), enhancement attached to count eighteen – four months; and on count twenty -- the low term of 16 months concurrent doubled to 32 months.[16] The court struck the section 12022.53, subdivision (b), firearm enhancement attached to count thirteen and the section 12022, subdivision (a), firearm enhancement attached to count nineteen. The court also struck the section 667, subdivision (a), five-year serious felony prior in the interest of justice "just given the aggregate sentence of 63 years is sufficient to cover the conduct involved in this case." The court also found a violation of probation on a trailing case and revoked and terminated probation.

## DISCUSSION

### I. The Parties' Contentions

Defendant asserts that the sentence imposed, which he characterizes as the functional equivalent of a life sentence imposed on an intellectually disabled person, amounts to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Defendant emphasizes his intellectual disability. "Even though in his twenties, [defendant] lived with his parents and his mother acted as payee of his social security

---

the nature of the offence, the Court does not find grounds for striking the use of the firearm. Use of a firearm is pretty much the sine qua non of an armed robbery, so the Court is not exercising its discretion."

[16] Because the original sentence imposed by the court on count twenty was statutorily unauthorized, it corrected it after receiving a letter from CDCR and sentenced defendant to the low term of 16 months, doubled for the strike prior, with the sentence to run concurrently.

11

benefits at the time of the instant offenses. [Defendant] requires verbal prompting with hygiene, cooking and laundry, can neither read nor write and spent the majority of his pre prison days playing basketball, working out, or watching television."

Defendant also asserts that his confederates were the leaders in the robberies, and were more aggressive, whereas he was quiet, passive, nervous, and "meek[]," following the other perpetrators' lead. He maintains the trial evidence demonstrated Williams was the leader of the crew and he recruited defendant to participate in the robberies. Defendant further asserts that, because Williams and Conway were his cousins, they were in a position to exert influence over him. He also contrasts the sentence imposed on his cohorts with the sentence he received. According to defendant, Williams, "the violent and manhandling leader of the 'crew' received an eight year sentence pursuant to a plea bargain," and Conway received a 29-year-and-four-month sentence. Defendant, however, received a term of 63 years. Defendant also emphasizes he was without an attorney during interrogation and was more likely to confess due to his intellectual disability.[17]

Defendant asserts that the sentence imposed was grossly disproportionate to his offenses. He further asserts that, by disregarding his intellectual disability, and therefore his purported diminished culpability, the trial court ignored prevailing United States Supreme Court authority, including *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825] (*Graham*) [imposition of life without the possibility of parole sentence for a non-homicide offense on a juvenile violates the Eighth Amendment prohibition against cruel and unusual punishment where there is no provision of a meaningful opportunity for release], *Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335] (*Atkins*) [imposition of the death penalty on a "mentally retarded" individual violates Eighth Amendment

---

[17] Defendant does not challenge the admissibility of his statement to the police.

prohibition against cruel and unusual punishment], and *Solem v. Helm* (1983) 463 U.S. 277, 300, 302 [77 L.Ed.2d 637] (*Solem*) [invalidating, under the Eighth Amendment, a life without parole sentence under a recidivist statute where the defendant was convicted of uttering a $100 "no account" check because the conviction offense involved "relatively minor criminal conduct," the defendant was treated more harshly than individuals convicted of more serious crimes within the state, and he was treated more severely than he would have been in any other state].

Defendant further maintains that the sentence imposed serves no legitimate penological goals. He asserts that "the culpability of an intellectually disabled offender – *especially* one who has the mental age of less than 10 years–surely does not merit the functional equivalent of" a life sentence. Defendant asserts that there is limited deterrent value when the offender lacks the wherewithal or cognitive ability to understand the moral reprehensibility of his or her actions. Additionally, a moderated sentence would not lessen the deterrent effect on other offenders who are not intellectually disabled, because they would not be similarly situated and "encompassed in the exemption."

The Attorney General emphasizes case law standing for the proposition that *Graham* only applies to crimes committed before an offender's 18th birthday. Because defendant was well over 18 when he committed the charged offenses, the only applicable question under Eighth Amendment analysis, and separately under the California Constitution, is whether the sentence was proportional. The Attorney General emphasizes the number of armed robberies, the fact that defendant was personally armed with a firearm, the emotional injuries inflicted on the victims, and defendant's recidivist status i.e., his prior strike conviction, in asserting that the sentence imposed was not grossly disproportionate. The Attorney General asserts that, on this record, defendant has established neither that he is intellectually disabled nor that the sentence imposed was grossly disproportionate "for a recidivist defendant convicted of several counts of armed

13

robbery, and where the defendant personally used a firearm during most of those armed robberies."

## II. Forfeiture

The Attorney General asserts that defendant has forfeited his claim by failing to raise the issue before the trial court.

Before imposing sentence, the trial court stated that it was rejecting the probation department's and the prosecution's recommendations that the court sentence defendant to an aggregate term of 75 years. The trial court stated: "It is the Court's intended sentence -- to impose an aggregate sentence of 63 years." The court then afforded the parties the opportunity to be heard.

Defense counsel stated: "[I]t's my belief and I think it was apparent through the course of the trial that -- and from the papers that I've submitted that [defendant] suffers from a moderate developmental disability; he has since birth. . . . [¶] My sense is . . . that but for the -- that Mr. Conway and Mr. Williams, the codefendants at the initiation of this case, were the prime movers relative to this series of robberies that occurred. There was evidence that a number of them had occurred before [defendant] was drafted into this robbery crew. [¶] I think it -- I think that a person like [defendant] who is -- who suffers from a moderate developmental disability is aware of his having that disability and tries to fit in; and, therefore, he is uniquely susceptible to outside influence. And I believe that is what occurred in this case. And I believe the persons that he was influenced by were Mr. Conway and Mr. Williams. [¶] I don't know what would have occurred from late -- into late 2016 relative to [defendant], but I know that if Mr. Conway and Mr. Williams were not in his life, that this series of robberies that he now stands convicted of, would likely not have occurred. And with that, I'll submit."

Defense counsel did not argue that the sentence constituted cruel and unusual punishment under the United States Constitution or the California Constitution when the trial court indicated the sentence it intended to impose or when the court actually imposed

14

sentence. Because defendant failed to make the contention that his sentence constituted cruel and unusual punishment in violation of the Eighth Amendment or article I, section 17, of the California Constitution in the trial court, he has forfeited the issue. (*People v. Baker* (2018) 20 Cal.App.5th 711, 720; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1248; *People v. Kelley* (1997) 52 Cal.App.4th 568, 583.) As this court has noted, the analysis requires a "fact specific" inquiry (*People v. Norman* (2003) 109 Cal.App.4th 221, 229 (*Norman*)), and those facts and their import to the analysis must be developed in the trial court. (*People v. Russell* (2010) 187 Cal.App.4th 981, 993 [the claim involves the type of issue that should be raised in trial court because trial judge, after hearing evidence, is in a better position to evaluate mitigating circumstances and determine their impact on constitutionality of sentence].) In a supplemental brief, defendant asserts that, to the extent his claim is forfeited, he was denied the constitutionally effective assistance of counsel. We shall consider defendant's contention in the context of his ineffective assistance of counsel claim. (*Norman*, at p. 229.)

### III. Cruel and Unusual Punishment Framework

"[I]t is . . . firmly established that '[t]he concept of proportionality is central to the Eighth Amendment,' and that '[e]mbodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." ' " (*In re Coley* (2012) 55 Cal.4th 524, 538, quoting *Graham, supra*, 560 U.S. at p. 59; accord, *People v. Contreras* (2018) 4 Cal.5th 349, 359 (*Contreras*).)

"The United States Supreme Court has interpreted the Eighth Amendment to impose unique constraints on the sentencing of *juveniles* who commit serious crimes. This case law reflects the principle that '*children are constitutionally different from adults for purposes of sentencing.*' " (*Contreras, supra*, 4 Cal.5th at p. 359, quoting *Miller v. Alabama* (2012) 567 U.S. 460, 471 [183 L.Ed.2d 407] (*Miller*), italics added.) However, "a defendant's 18th birthday marks a bright line." (*People v. Edwards* (2019)

15

34 Cal.App.5th 183, 190 (*Edwards*).) And as this court has noted, "The Eighth Amendment proportionality guarantee applies very differently to prison terms for adult offenders." (*In re Bolton* (2019) 40 Cal.App.5th 611, 622.) Indeed, the Eighth Amendment's proportionality principle is *narrow* in the context of non-capital sentences for adult offenders. (*Ibid.*; *Edwards*, at p. 190, both citing *Ewing v. California* (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108, 117] (*Ewing*).) "It ' "does not require strict proportionality between crime and sentence," ' but prohibits ' "extreme sentences that are 'grossly disproportionate' to the crime." ' " (*In re Bolton*, at p. 622.)

In determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime, " '[a] court must begin by comparing the gravity of the offense and severity of the sentence. [Citation.] "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual.' " (*In re Coley, supra*, 55 Cal.4th at p. 542, quoting *Graham, supra*, 560 U.S. at p. 60.) For recidivists, the gravity of the offense consideration in the Eight Amendment analysis is not limited to the offense itself, but rather it includes the offense plus having been convicted of a prior serious or violent felony offense. (*Ewing, supra*, 538 U.S. at p. 28 [concluding that California's Three Strikes law does not violate the Eighth Amendment prohibition against cruel and unusual punishment; "The gravity of [the defendant's] offense was not merely 'shoplifting three golf clubs.' Rather, [the defendant] was convicted of felony grand theft for stealing nearly $1,200 worth of merchandise after previously having been convicted of at least two 'violent' or 'serious' felonies"].)

Regarding Eighth Amendment claims, "[r]eviewing courts must ' "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." ' " (*Edwards, supra,* 34 Cal.App.5th at pp. 190-191, quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 999 [115 L.Ed.2d 836, 867] (opn. of Kennedy, J., conc. in part & conc. in the judg.) & *Solem, supra*, 463 U.S. at p. 290.) " '[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.' " (*Ewing, supra*, 538 U.S. at p. 21, quoting *Rummel v. Estelle* (1980) 445 U.S. 263, 272 [63 L.Ed.2d 382].)

California's prohibition on "cruel or unusual punishment" (Cal. Const., art. I, § 17) has been read to bar any sentence " 'so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Boyce* (2014) 59 Cal.4th 672, 721 (*Boyce*), quoting *In re Lynch* (1972) 8 Cal.3d 410, 424, italics omitted.) California courts examine three criteria in assessing disproportionality:  (1) the nature of the offense and offender, with emphasis on his danger to society; (2) the penalty imposed compared with the penalties for more serious crimes in California; and (3) the punishment for the same offense in other jurisdictions.  (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806 (*Christensen*); accord, *In re Lynch*, at pp. 425-427.)

### IV.  Ineffective Assistance of Counsel

### A.  Ineffective Assistance of Counsel Framework

In a supplemental opening brief, defendant asserts he was deprived of the constitutionally effective assistance of counsel by his trial counsel's failure to argue that the sentence imposed constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367 (*Rogers*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

## B.  Deficient Performance

### 1. *Graham*, *Miller*, and *Atkins*

Defendant's arguments are premised primarily on United States Supreme Court jurisprudence addressing the Eighth Amendment in connection with juveniles sentenced to terms of life without parole (*Miller, supra*, 567 U.S. 460; *Graham. supra*, 560 U.S. 48) and the imposition of the death penalty on offenders with mental disabilities (*Atkins, supra*, 536 U.S. 304).  Defendant asserts that the analysis of his claim properly comes under these cases where the United States Supreme Court has employed a categorical approach, such as *Graham*, *Miller*, and *Atkins*, and similar cases, and that, under these cases, his sentence is unconstitutional.  Defendant asserts that it is clear, particularly since the United States Supreme Court decided *Graham* and *Miller*, that there is a national consensus against the imposition of a life sentence on the intellectually disabled.

It is true that the United States Supreme Court "has derived a number of limitations on juvenile sentencing:  (1) no individual may be executed for an offense committed when he or she was a juvenile" (*People v. Franklin* (2016) 63 Cal.4th 261, 273-274, citing *Roper v. Simmons* (2005) 543 U.S. 551, 578 [161 L.Ed.2d 1, 28] (*Roper*)); "(2) no juvenile who commits a nonhomicide offense may be sentenced to LWOP" (*Franklin*, at pp. 273-274, citing *Graham, supra*, 560 U.S. at p. 74), "and (3) no

18

juvenile who commits a homicide offense may be automatically sentenced to LWOP" (*Franklin*, at pp. 273-274, citing *Miller, supra*, 567 U.S. at p. 465). However, this line of cases explicitly applies to juvenile sentencing. At the time defendant committed all of the crimes at issue here, he was 28 years old. He was 30 years old at sentencing.

An underlying rationale concerning the juvenile sentencing line of cases is that "children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability *and greater prospects for reform . . .* , 'they are less deserving of the most severe punishments.' " (*Miller, supra*, 567 U.S. at p. 471, quoting *Graham, supra*, 560 U.S. at p.68, italics added.) The high court identified three ways in which juvenile culpability differed from adults for purposes of sentencing: (1) "children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking"; (2) "children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) "a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " (*Miller*, at p. 471, quoting *Roper, supra*, 543 U.S. at pp. 569, 570.)

But juvenile culpability is not the only characteristic that makes juveniles different. A second distinguishing characteristic is the prospect for reform and rehabilitation. As stated in *Graham* in the context of life sentences without the possibility of parole, "[t]hose who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes *committed before adulthood* will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Graham, supra*, 560 U.S. at p. 75, italics added.)

19

However, crucially, these lines of cases have no applicability to the circumstances of defendant who was 28 when he committed the crimes at issue here and 30 at sentencing. "[A] defendant's 18th birthday marks a bright line, and only for crimes committed before that date can he or she take advantage of the *Graham*/[*People v. Caballero* (2012) 55 Cal.4th 262] jurisprudence in arguing cruel and unusual punishment." (*Edwards, supra*, 34 Cal.App.5th at p. 190.)

Defendant relies on his developmental disability and his related purported mental age in advancing his contentions. He asserts, without citation to authority, that "[a]n intellectually disabled person, such as [defendant], is no different than a juvenile offender." (Italics omitted.) However, the United States Supreme Court has not applied the foregoing line of cases addressed to juvenile offenders to adult defendants with developmental disabilities. We decline to make this leap ourselves as defendant urges. We note, among other things, that a key component of the underlying rationale applicable to juvenile offenders does not apply to defendant. Unlike juvenile offenders, who are in the midst of their growth, development, and maturation, who are, in other words, undergoing significant physical, mental, and psychological changes (see generally *Miller, supra*, 567 U.S. at p. 471), there is no indication that adults, developmentally disabled or otherwise, likewise face the prospect of such significant future change or the same potential for reform and rehabilitation.

Defendant also relies heavily on *Atkins, supra*, 536 U.S. 304. In *Atkins*, the United States Supreme Court concluded "the Eighth Amendment prohibits application of the death penalty to mentally disabled persons . . . ." (*In re Bolton, supra*, 40 Cal.App.5th at p. 616, citing *Atkins*, at p. 321.) The majority in *Atkins* concluded: "death is not a suitable punishment for a mentally retarded criminal. We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such

20

punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." (*Atkins*, at p. 321.) In addition to the societal purposes for the death penalty—retribution and deterrence—the majority in *Atkins* considered the possibility that the "risk 'that the death penalty will be imposed in spite of factors which may call for a less severe penalty,' [citation], is enhanced, not only by the possibility of false confessions, but also by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors." (*Id.* at p. 320.)

The concerns discussed in *Atkins* related to the retributive and deterrent purposes served by the death penalty when imposed upon those with mental disabilities are simply not implicated here because the death penalty, the subject of the high court's analysis in *Atkins*, is not at issue here. Indeed, it is important to note that the high court in *Atkins* did not prohibit an LWOP sentence for "mentally retarded" (the more appropriate term is developmentally disabled) adult defendants. Instead, the high court was careful to note: "Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes." (*Atkins*, *supra*, 536 U.S. at p. 306.) Thus, *Atkins* does not help defendant, even if his sentence is the functional equivalent of LWOP.

Defendant asserts otherwise. He argues: "Just as 17 years ago –at the time *Atkins* was decided –'it [was] fair to say that a national consensus ha[d] developed against' execution of the intellectually disabled, now, it would be fair to say, especially in light of the Supreme Court's ruling in *Graham* and *Miller* (eight and ten years, respectively, after *Atkins* was decided), that a national consensus has emerged against the imposition of a life sentence on the intellectually disabled –those who have the mental age of children." However, defendant cites no other authority for this premise, beyond asserting that his legal research did "not reveal a single case where a court imposed this sort of a sentence despite acknowledging that the defendant exhibited moderate intellectually disability."

21

Defendant relies upon the societal consensus addressed in *Atkins*, but that consensus addressed by the high court was against imposition of the death penalty on defendants with mental disabilities. (*Atkins, supra*, 536 U.S. at pp. 306-307, 313-317.) "This consensus unquestionably reflects widespread judgment about the relative culpability of mentally retarded offenders, *and the relationship between mental retardation and the penological purposes served by the death penalty*." (*Id*. at p. 317, italics added.) Again, *Atkins* is inapposite here where the death penalty is not implicated.

While attempting to draw analogies to the United States Supreme Court jurisprudence, defendant acknowledges that, "as of now, no court has held that the functional equivalent of a life sentence imposed upon an intellectually disabled [adult] defendant is unconstitutional" under the Eighth Amendment to the United States Constitution or article I, section 17, of the California Constitution. Indeed, defendant is expressly "asking this [c]ourt to pronounce a new rule of law in light of existing United States Supreme Court precedents." We conclude that, even assuming defendant is intellectually disabled to the extent represented in his briefing on appeal, the case law on which defendant relies simply does not support the premise that it is categorically unconstitutional to sentence a developmentally disabled adult recidivist to a lengthy determinate term for multiple armed robberies. Consequently, we decline to broaden the scope of that case law.[18]

We conclude that defense counsel's performance was not deficient for failing to raise constitutional challenges to defendant's sentence based on these inapplicable precedents. Nevertheless, we address whether defendant's sentence violates the Eighth

---

[18]  As noted, reviewing courts grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes. (*Edwards, supra,* 34 Cal.App.5th at pp. 190-191.) And it would be well within the Legislature's prerogative to enact statutes addressing sentencing of demonstrably developmentally disabled persons.

Amendment to the United States Constitution or article I, section 17, of the California Constitution based on proportionality considerations in further considering the question of deficient performance and in considering the separate question of prejudice.

### 2. Constitutional Proportionality

To determine whether defendant's sentence is grossly disproportionate, we must compare the gravity of defendant's offenses and the severity of the sentence imposed. (*In re Coley, supra*, 55 Cal.4th at p. 542.)

Defendant received what is obviously a lengthy sentence. The trial court sentenced him to an aggregate term of 63 years, and as noted, he was 30 years old at the time of sentencing.

But defendant's current offenses are serious and numerous. He and his confederates committed a string of armed robberies and attempted armed robberies over a two-month period. It appears he would have continued to do so if he had not been caught. Defendant stands convicted of 11 counts of second degree robbery (§§ 211, 212.5, subd. (c)), and two counts of attempted second degree robbery (§§ 211, 212.5, subd. (c), 664), as well as one count of felon in possession of a firearm (§ 29800, subd. (a)(1)). The jury found that, in the commission of eight of the robbery and attempted robbery offenses, defendant personally used a firearm. (§ 12022.53, subd. (b).) Additionally, the jury found that, in connection with two other counts, a principal was armed with a firearm. (§ 12022, subd. (a)(1).) It appears that defendant used his car to facilitate the robberies in which he was involved. Although the victims were not physically injured, they sustained emotional harm; the court noted that "several of them quit [their] jobs" after they were robbed.

Moreover, defendant is not subject to a lengthy sentence " ' "merely on the basis of his current offense but on the basis of his recidivist behavior. Recidivism in the commission of multiple felonies poses a manifest danger to society[,] justifying the imposition of longer sentences for subsequent offenses." ' " (*People v. Mantanez* (2002)

23

98 Cal.App.4th 354, 366, quoting *People v. Stone* (1999) 75 Cal.App.4th 707, 715.) As we have noted, for Eighth Amendment purposes, the gravity of the crime consideration includes not only the offense, but also a defendant's repetitious commission of serious or violent felony offenses. (*Ewing*, *supra*, 538 U.S. at p. 28.) Indeed the *Ewing* court observed, "[r]ecidivism has long been recognized as a legitimate basis for increased punishment" and the state has a "public safety interest in incapacitating and deterring recidivist felons." (*Id*. at pp. 25, 29.) Similarly, as we have noted, for purposes of California's cruel or unusual punishment analysis, the first consideration is "the nature of the offense and offender" with emphasis on his danger to society. (*Christensen*, *supra*, 229 Cal.App.4th at p. 806.)

Defendant faults the trial court for sentencing him to the "functional equivalent of a life sentence" "without any regard of [his] intellectual disability or his difficult childhood." Defendant's contention is belied by the record. There is no question that defendant's mental challenges should be considered in the mix of mitigating and aggravating factors pertinent to a trial court's sentencing decision, and the court did so here. In sentencing defendant, the trial court stated that it had read the materials submitted by the defense, including psychological evaluations. The court noted that defendant's developmental disabilities were documented. The court stated that the submissions also described defendant's difficult childhood and the challenges he faced growing up.

We recognize defendant's reliance on *Atkins*, notwithstanding the fact that the death penalty is not implicated here, for the premise that mental disabilities bear on a defendant's individual culpability. (*Atkins, supra*, 536 U.S. at p. 317 [the national consensus against imposition of the death penalty on mentally disabled individuals reflects widespread judgment about the relative culpability of such offenders].) However, even accepting as true defendant's representations concerning his mental disabilities, based on his circumstances, the offenses, his status as a recidivist, and the

24

sentence imposed, we cannot conclude there is gross disproportionality here. (See generally *Graham, supra*, 560 U.S. at p. 60; *In re Coley, supra*, 55 Cal.4th at p. 542.) This is simply not the " ' "rare case in which [this] threshold comparison" ' " of the gravity of defendant's offenses and the severity of the sentence imposed " ' "leads to an inference of gross disproportionality . . ." ' " under the Eighth Amendment. (*In re Coley*, at p. 542.)

We have addressed the nature of the offenses and offender. Defendant advances no substantive arguments concerning the penalty imposed on him compared with the penalties for more serious crimes in California or the punishment for the same offense in other jurisdictions. (See generally *Solem, supra,* 463 U.S. at pp. 300, 302; *In re Coley, supra*, 55 Cal.4th at p. 542; *In re Lynch, supra*, 8 Cal.3d at pp. 425-427; *Christensen, supra*, 229 Cal.App.4th at p. 806.)

We conclude that the sentence imposed by the trial court did not violate the Eighth Amendment to the United States Constitution or article I, section 17, of the California Constitution. His sentence was not grossly disproportionate (*In re Coley, supra*, 55 Cal.4th at p. 542), nor was it " 'so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity' " (*Boyce, supra*, 59 Cal.4th at p. 721, quoting *In re Lynch, supra*, 8 Cal.3d at p. 424, italics omitted). As such, defense counsel cannot be deemed ineffective for failing to make this argument before the sentencing court. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463 [counsel is not constitutionally ineffective for failing to raise a meritless objection]; *People v. Pierce* (2015) 234 Cal.App.4th 1334, 1337 [same].)

### C. Prejudice

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient.

(*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) "*The likelihood of a different result must be substantial*, not just conceivable." (*Richter*, at p. 112, italics added; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75; *In re M.P.* (2013) 217 Cal.App.4th 441, 457, fn. 10.)

Defendant was not prejudiced by his trial counsel's failure to make a cruel and unusual punishment argument under the Eighth Amendment to the United States Constitution or a cruel or unusual punishment argument under article I, section 17, of the California Constitution because he has not shown there is a reasonable probability that he would have received a more favorable result had counsel made the argument. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

## DISPOSITION[19]

The judgment is affirmed.

_____/s/_____
MURRAY, J.

We concur:

_____/s/_____
HULL, Acting P. J.

_____/s/_____
KRAUSE, J.

---

[19] In light of our determinations, we need not discuss the Attorney General's contentions concerning defendant's alleged reliance on matter outside the record regarding defendant's mental challenges.